KRAVITCH, Senior Circuit Judge,
concurring in part and dissenting in part:
I concur in the portions of the majority opinion affirming the district court’s denial of habeas relief with respect to Cargill’s convictions. I respectfully dissent, however, from the majority’s affirmance of the denial of habeas relief as to sentencing because I disagree with the majority’s treatment of what, in my view, were improper closing remarks made by the prosecutor. Because I conclude that these improper closing remarks rendered the sentencing proceeding fundamentally unfair, I would reverse the district court’s denial of relief as to sentencing.
During the sentencing phase of Cargill’s trial, the prosecutor told the jury:
[Cargill’s] salvation and what Almighty God does to him for what he’s done does not concern us, for society has a right to demand that he pay a price for the events that he has done. Is the appropriate price life imprisonment, and 10 years or 15 years or ever how long it is, seven years or five years, when a bunch of little boys are sitting around the Christmas table thinking, “Is that all that jury thought of my mama and daddy because that man is sitting off somewhere eating Christmas turkey dinner?”
(Tr. 1426-27) (emphasis added). The majority reads these remarks as referring not to the possibility of Cargill’s release on parole within five to fifteen years but rather to the fact that Cargill, if sentenced to life by the jury for murder, could receive an additional sentence for armed robbery of between five and fifteen years, as determined by the judge. Because the majority reads the quoted passage as accurately stating Georgia law, it concludes that the prosecutor’s remarks were neither improper nor prejudicial. I respectfully disagree.
I concede that the majority’s technical parsing of the prosecutor’s closing argument is plausible. I cannot agree, however, with the majority’s assertion that the quoted remarks were not improper. If the prosecutor intended to refer to Cargill’s possible release on parole, the remarks clearly would have been improper. See Ga.Code Ann. § 17-8-76(a) (1990) (prohibiting attorneys from informing jurors of the possibility of clemency, pardon, or parole).[1] Even if the prosecutor intended to refer only to the additional sentence that Cargill would receive for armed robbery, I doubt that a jury of lay persons, without further explanation, would have understood this reference. Rather, I believe that these remarks created a substantial danger that a jury would be misled into believing that, if sentenced to life, Cargill could be released from prison after serving as few as five years.[2]
The prosecutor questioned: “Is the appropriate price life imprisonment, and 10 years or 15 years or ever how long it is, seven years or five years ... ?” Because the prosecutor made this statement without any reference to an additional sentence for the armed robbery counts, I do not believe that a jury untrained in the technicalities of Georgia’s sentencing procedure would focus, as the majority does, on the prosecutor’s use of the word “and.” It thus seems unlikely that a jury would have understood the prosecutor’s *1388 remarks as referring to a previously unmentioned sentence for armed robbery.[3]
Moreover, the prosecutor implied that if sentenced to life, Cargill would be released on parole and would be “off somewhere eating Christmas turkey dinner” at the same time “a bunch of little boys” (the victims’ children) were wondering why the defendant was released. By referring to a “bunch of little boys,” the prosecutor implied that the defendant would be released (“off somewhere”) in a relatively short period of time— for if Cargill served the time required by Georgia law prior to becoming eligible for parole, the victims’ children hardly would be the “bunch of little boys” the prosecutor described. In addition, the inference that the defendant would be released after serving only a small fraction of the life sentence was reinforced by the prosecutor’s reference to life imprisonment as a “judicial slap on the wrist.” (Tr. 1439).[4]
Because these statements created a substantial likelihood that the jury was misled into believing that a sentence of anything less than death could result in Cargill’s release from prison in as few as five years, I conclude that the prosecutor erred in placing them before the jury. As the majority notes, however, improper prosecutorial argument does not entitle a habeas petitioner to relief unless there is a “reasonable probability that, but for [the improper] arguments, the death verdict would not have been given.” Brooks v. Kemp, 762 F.2d at 1413. A “reasonable probability” is a probability sufficient to undermine confidence in the jury’s verdict. Wilson v. Kemp, 777 F.2d 621, 623 (11th Cir.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). Relying mainly on the supposed ameliorative effect of the defense counsel’s closing argument and the trial court’s instructions to the jury, the majority concludes that the prosecutor’s remarks did not prejudice Cargill. I cannot join this conclusion.
In my view, neither Cargill’s counsel nor the trial court effectively dispelled the misim-pression created by the prosecutor that Car-gill’s “life sentence” could last as few as five years. In urging the jury to choose life, defense counsel referred to a “sentence of imprisonment for the rest of his life.” (Tr. 1448-49). With such a verdict, defense counsel noted, the defendant would be “placed in prison for the remainder of his natural life.” (Tr. 1449). These statements describe the option of a “life sentence” in generic terms, and thus do little to rebut the prosecutor’s suggestion that Cargill would be released from prison in “10 years or 15 years, or ever how long it is, seven years or five years.” Importantly, defense counsel made no reference to Cargill’s period of ineligibility for parole or to a specific period of confinement because he was barred from doing so. Only the prosecutor referred to the number of years that Cargill might actually be required to serve, and I do not believe that defense counsel’s references to the harshness of a life sentence erased from the jury’s mind the impression that Cargill could be released in as few as five years.[5]
Similarly, the trial court’s instructions did not counteract the impression that Cargill *1389 would be required to serve only a small fraction of a life sentence. The trial court merely instructed jurors that if they were to fix the penalty at life imprisonment “the defendant would be sentenced to serve the remainder of his life in the penitentiary.” (Tr. 1462) (emphasis added). Because this instruction said nothing about how much of a life sentence Cargill would actually be required to serve before becoming eligible for parole, it did nothing to dispel the misim-pression created by the prosecution. The trial court could have effectively negated the damage by informing the jury that the prosecutor’s remarks referred to an additional sentence for armed robbery that it would impose. Despite an objection by Cargill’s counsel, the trial court did not take this precautionary step.[6] As a result, the jury was left with the erroneous impression that “life imprisonment” amounted to nothing more than a “judicial slap on the wrist.”
In my view, the unrebutted remarks of the prosecutor created an unacceptable risk that the jury sentenced Cargill to death because it misunderstood its sentencing options. Throughout his closing argument, the prosecutor stressed to the jury that in choosing between the death sentence and life imprisonment it had the duty to choose the “appropriate” punishment. Because of the improper remarks, however, the jury was left with a false choice: sentence a convicted double murderer to death or grant him the chance of being released from prison within five years. Given only these two options, it is hardly surprising that the jury chose the death penalty. Cf. Simmons v. South Carolina, 512 U.S. 154, 161-63, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994) (defendant denied due process because sentencing jury was provided with “false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration”).[7]
The availability of alternative punishments undoubtedly affects the manner in which a capital sentencing jury reaches its decision. Researchers have found that the number of years a jury believes a defendant will actually serve if sentenced to life is a vital factor in a jury’s decision to choose life imprisonment instead of the death penalty. See Simmons, 114 S.Ct. at 2191, 512 U.S. at 157-58 (citing study in which more than 75% of South Carolina citizens indicated that the amount of time the convicted murderer actually would have to spend in prison would be “extremely important” or “very important” factor in choosing between life and death); James Lu-ginbuhl and Juile Howe, Discretion in Capital Sentencing Instructions: Guided or Misguided.?, 70 Ind. L.J. 1161,1178 (1995) (study of North Carolina jurors revealed that of jurors who sentenced defendant to death, 74% believed that he would serve less than 20 years, whereas of jurors who sentenced defendant to life, 72% believed that he would remain in prison for at least 20 years); Theodore Eisenberg and Martin T. Wells, Deadly Confusion: Juror Instructions in Capital Cases, 79 Cornell L.Rev. 1, 7 (1993) (“[J]u-rors who believe the alternative to death is a relatively short time in prison tend to sentence to death. Jurors who believe the alternative treatment is longer tend to sentence to life.”); Anthony Paduano and Clive A Stafford Smith, Deathly Errors: Juror Mis-perceptions Concerning Parole in the Imposition of the Death Penalty, 18 Colum. Hum. Rts. L.Rev. 211, 220-25 (1987) (recounting study of Georgia capital jurors in which over two-thirds indicated that they would be more likely to impose a sentence of life if assured that “life” meant at least twenty-five years).
In my view, the jury in this case, which had the discretion to choose life over the death penalty for any reason,[8] was misled *1390 with respect to an extremely important sentencing factor. It was led to believe that a convicted double murderer might walk away in five years if sentenced to life in prison. In essence, this erroneous impression stripped the jury of its sentencing discretion, and thus rendered Cargill’s sentencing proceeding fundamentally unfair. Had the jury not been misled, there is a reasonable probability that at least one juror would have refused to sentence Cargill to death.[9]
Accordingly, I would reverse the district court’s denial of habeas relief as to Cargill’s death sentence and would remand this ease to the district court with instructions to issue the writ setting aside the death sentence unless the State affords Cargill a new sentencing proceeding before a newly empaneled jury.

. Since Cargill’s trial, the Georgia legislature has authorized argument to the jury on the issue of parole in the sentencing phase of death penalty trials. See Ga.Code Ann. § 17-10-31.1(d) (1993); Jenkins v. State, 265 Ga. 539, 458 S.E.2d 477, 478 (1995). Even under this new statute, however, it would be improper to mislead a jury as to the length of time a defendant would be required to serve before becoming eligible for parole.

. Georgia law required that had Cargill been given consecutive life sentences on each of the four felonies for which he had been convicted, he would have been ineligible for parole for at least 30 years. Ga.Code Ann. § 42-9-39(c) (1994).

. During the sentencing hearing, neither the judge nor the prosecutor referred to this additional sentence for the armed robbery counts. Instead, the prosecutor simply referred to the choice between "the death penalty and the life sentence,” (Tr. 1413), and the judge instructed the jury that it was its "duty to determine within the limits prescribed by law what punishment will be imposed for [the] offense [of murder].” (Tr. 1458).

. In urging the jury to choose the death penalty over life imprisonment, the prosecutor also told the jury: "I submit to you that criminals who go out and do these acts, number one, feel like that they are so smart they’ll never get caught; and, number two, they'll be punished in a very modest fashion. It will be an inconvenience, just like the overhead for a business, paying the electric bill, and he will try it over and over again.” (Tr. 1418) (emphasis added). These references reinforced the erroneous impression that a life sentence would result in a relatively short period of incarceration. The fact that the prosecutor later stated that "I’m not telling you that a life sentence in a Georgia penitentiary is any piece of cake,” (Tr. 1437), does not in my view negate the impression that Cargill would be released within five to fifteen years.

.This circuit has recognized that "[ajrguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.” Drake v. Kemp, 762 F.2d 1449, 1459 (1985) (en banc), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986).

.Cargill’s counsel brought the improper statements to the court's attention immediately after the jury charge and, at that time, moved for a mistrial. In addition, at the beginning of the sentencing hearing, Cargill sought to introduce evidence of his ineligibility for parole. In accordance with Georgia law, the trial court denied this request.

. In Simmons, the Court held that a capital defendant has a due process right to inform the sentencing jury of his ineligibility for parole if the prosecution argues that he presents a future danger to society. 512 U.S. at 171-73, 114 S.Ct. at 2198.

. The trial judge made clear in its instructions that the jury had complete discretion to choose *1390 life imprisonment over the death penalty. It stated:
[W]hether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment.... You may fix the penalty at life imprisonment if you see fit to do so for any reason satisfactory to you or without any reason.
(Tr. 1461-62).

. Under Georgia law, if the sentencing jury does not unanimously recommend the death penally, the trial court must impose a sentence of life imprisonment. Hill v. State, 250 Ga. 821, 301 S.E.2d 269, 270 (1983).