

2008 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

9-3-2008

# Kindler v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 03-9010

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Kindler v. Horn" (2008). *2008 Decisions.* Paper 461.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/461

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos: 03-9010 & 03-9011
_____

JOSEPH J. Kindler,

Appellee/Cross-Appellant

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections, *DAVID DIGUGLIELMO, Superintendent of
the State Correctional Institution at Graterford, JOSEPH P.
MAZURKIEWICZ, Superintendent of the State Correctional
Institution at Rockview,

Appellant/Cross-Appellees

*(Amended Per Clerk's Order dated 1/6/05
_____

Appeal from the District Court
for the Eastern District of Pennsylvania
(Civil Action No. 99-cv-00161)
District Judge: Honorable J. Curtis Joyner
_____
Argued October 15, 2007

BEFORE: McKEE, FUENTES, and
STAPLETON <u>Circuit Judges</u>

(Opinion filed: September 3, 2008)


MATTHEW C. LAWRY, ESQ. (Argued)
MARIA K. PULZETTI, ESQ.    (Argued)
STEPHEN L. MARLEY, ESQ.
MAUREEN K. ROWLEY, ESQ.
The Curtis Center, Suite 545 West
Independence Square West
Phila., PA 19106-0000

<u>Attorneys for Appellee/Cross-Appellant</u>


DAVID CURTIS GLEBE, ESQ. (Argued)
Assistant District Attorney
THOMAS W. DOLGENOS, ESQ.
Chief, Federal Litigation
Chief of Appeals
RONALD EISENBERG, ESQ.
Deputy, Law Division
Lynne Abraham, ESQ.
District Attorney
Three South Penn Square
Phila., PA 19107-3499

<u>Attorneys for Appellant/Cross-Appellees</u>

OPINION

McKEE, Circuit Judge.

Joseph Kindler was sentenced to death after being convicted of the first degree murder of David Bernstein. After unsuccessfully appealing in state court, Kindler filed this habeas petition in district court alleging, *inter alia*, that the trial court's jury instructions violated the Supreme Court's pronouncement in *Mills v. Maryland*, 486 U.S. 367 (1988), and that his trial counsel had been ineffective during the penalty phase of his trial. The district court agreed that Kindler was entitled to relief under *Mills*, and also concluded that he had established two additional claims of prosecutorial misconduct. The court granted relief on those grounds while denying his remaining claims. The Commonwealth appealed, and Kindler filed a cross appeal in which he challenged the district court's denial of his

3

remaining claims for relief.[1]  For the reasons that follow, we will affirm the district court's grant of habeas relief based on the Supreme Court's decision in *Mills*. We will reverse the district court's denial of relief based on ineffective assistance of counsel during the penalty phase of the trial.  Because we grant Kindler's relief on his ineffective assistance of counsel and *Mills* claims, we decline to review his claims of prosecutorial misconduct.

Ultimately, we conclude that Kindler is entitled to the habeas relief that the district court ordered, and we will affirm.

## I.  Factual and Procedural Background

### A. The Crime.

In 1982, Joseph Kindler, Scott Shaw, and David

---

[1] The claims raised in the appeal and cross-appeal are so closely intertwined that we will address the various claims issue by issue rather than discussing the appeal and cross appeal separately.

4

Bernstein burglarized a store in Lower Moreland Township, Pennsylvania. Police stopped their "getaway" car as they sped from the scene, and took Shaw and Bernstein into custody. Somehow, Kindler managed to escape. However, under police questioning, Bernstein identified Kindler as the driver of the getaway car and the mastermind behind the burglary. Bernstein also offered to testify against both Kindler and Shaw. Armed with this information, police obtained a warrant and arrested Kindler. The warrant identified Bernstein as the informant, and Kindler subsquently learned that Bernstein had been granted immunity so he could testify against Kindler.

Following his arrest, and subsequent release on bail, Kindler, along with Shaw and Shaw's girlfriend, Michelle Raifer, devised a plan to kill Bernstein in order to silence him. Pursuant to that plan, Raifer lured Bernstein to the door of his apartment in the early morning hours of July 25, 1982. Kindler,

5

who had been lying in wait, attacked Bernstein and struck him over the head with a baseball bat approximately 20 times. Acting on Kindler's instructions, Shaw then jabbed Bernstein in the ribs with an electric prod numerous times. Kindler and Shaw then dragged an immobilized Bernstein to Raifer's waiting car, leaving a 30-foot trail of blood behind. The two threw Bernstein into the trunk of the car and then drove to the banks of the Delaware River where they took Bernstein from the trunk and threw him into the river. Miraculously, Bernstein was still alive when he was thrown into the river. Upon realizing that their blows had not killed Bernstein, Kindler and Shaw managed to fill Bernstein's lungs with water and then they tied a cinder block around his neck to weigh him down.

Kindler, Shaw, and Raifer then drove back to Kindler's home. They discarded their weapons and other physical evidence by throwing them down various sewer inlets along the

6

way. Despite those "precautions," the plan began unraveling almost immediately because police tracked down Raifer's blood-soaked car within a few hours of the crime. Bernstein's girlfriend and others had seen it during the course of the killing. Raifer confessed after police confronted her with evidence that tied her to the assault. In her confession, she implicated Kindler and Shaw, and directed police to the various sewer inlets where they had thrown the evidence. To further complicate matters, Bernstein's body surfaced the next day. During a subsequent examination, police established that he died from drowning and massive head injuries.

**B. The Trial and Kindle's Post-Verdict Motions.**

Kindler and Shaw were jointly tried for Bernstein's murder in state court, and the jury convicted both of first-degree murder and criminal conspiracy. During the ensuing penalty hearing, the jury found two aggravating circumstances

7

pertaining to Kindler; *viz*, he killed Bernstein to prevent him from testifying, *see* 42 Pa. Cons. Stat. § 9711(d)(5), and he committed the killing while perpetrating a felony - kidnapping. *See* 42 Pa. Cons. Stat. § 9711(d)(6). Although the Commonwealth also argued that the "offense was committed by means of torture," 42 Pa. Cons. Stat. § 9711(d)(8), the jury did not find that aggravating circumstance. The jury found no mitigating circumstances in favor of Kindler. Thus, pursuant to 42 Pa. Cons. Stat. § 9711(c)(1)(iv), Kindler was given the death penalty.[2] After the penalty hearing, but before the sentence was formally imposed, Kindler filed post-verdict motions with the assistance of new counsel.[3]

---

[2] Shaw received a sentence of life imprisonment.

[3] In Pennsylvania, the death sentence is received and recorded by the court after the jury determines the sentence. The court formally imposes the sentence sometime later. *See* 42 Pa. Cons. Stat. § 9711(g).

On September 19, 1984, while the post-verdict motions were pending, Kindler escaped from a Philadelphia jail where he was being held. Following the escape, the Commonwealth immediately moved to dismiss his post-verdict motions because he was then a fugitive. The trial court granted that motion holding that Kindler had waived any right to have his post-verdict motions considered by escaping.

Kindler was eventually arrested on new criminal charges as well as on immigration violations in Canada. However, soon after his arrest there, he once again managed to escape. This time, he used bed sheets to create a makeshift rope to escape from the thirteenth floor of the facility in Montreal where he was being held. He was captured once again in New Brunswick Canada in 1988.

Upon being returned to Philadelphia in 1991, Kindler moved to reinstate his post-verdict motions; the trial court

9

denied the motion.

**C. Kindler's Direct Appeal and State Post-Conviction Proceedings**

On October 3, 1991, the trial court formally imposed Kindler's death sentence for the murder conviction, as well as a consecutive term of 10 to 20 years imprisonment for the kidnapping, and a concurrent term of five to 10 years for criminal conspiracy. Kindler appealed arguing that the trial court should have addressed the merits of his post-verdict motions upon his capture and return to Philadelphia. The Superior Court rejected the argument and upheld his conviction and sentence; the Pennsylvania Supreme Court affirmed. *See Commonwealth v. Kindler*, 639 A.2d 1 (Pa. 1994). The Pennsylvania Supreme Court ruled that the trial court had properly denied Kindler's post-verdict motions without considering the merits because of Kindler's escape. *Id.* at 3

10

("[T]he action taken in dismissing the post-verdict motions was a reasonable response to [Kindler]'s 'flouting' of the authority of the court"). The Court concluded that the escape resulted in Kindler waiving all claims of error and preserving nothing for appeal. Nevertheless, given the death sentence, the court reviewed the record as required by 42 Pa. Cons. Stat. § 9711(h)(3), and found no error.[4] The Court therefore affirmed

---

[4] At the time of Kindler's direct appeal, 42 Pa. Cons. Stat. § 9711(h), titled "Review of death sentence," provided as follows:

> (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
> (2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).
> (3) The Supreme Court shall affirm the sentence of death unless it determines that:
> (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

11

the conviction and sentence. On October 11, 1994, the United

States Supreme Court denied *certiorari*.

On January 11, 1996, Kindler filed a petition under

Pennsylvania's Post-Conviction Relief Act ("PCRA") in which

he asked the court to adjudicate the merits of the claims he had

---

> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or
> (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime
> and the character and record of the defendant.
> (4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).

raised on direct appeal. The PCRA court denied the petition without a hearing because the Pennsylvania Supreme Court had already ruled that Kindler's escape resulted in a waiver of all appellate claims he may otherwise have had. The Pennsylvania Supreme Court subsequently affirmed, agreeing that Kindler was ineligible for PCRA relief. *Commonwealth v. Kindler*, 722 A.2d 143, 148 (Pa. 1998). The Court also concluded that Kindler's claims had been previously litigated because he had challenged the dismissal of his post-verdict motions on direct appeal. The Court explained: "[t]o grant [Kindler] the relief he requests in his PCRA, an evidentiary hearing on claims already forfeited by his flight from captivity, would render meaningless all previous rulings of the trial court and of this Court." *Id.* at 148. The Court rejected Kindler's argument that Pennsylvania's "relaxed waiver" doctrine permitted review of the merits of his claim. Although that doctrine allowed courts to look past a

13

procedural default and reach the merits of claims in a capital case, the Court reasoned that the doctrine did not apply to Kindler because it was "his own act of becoming a fugitive that resulted in the forfeiture of the right to review of those claims." *Id.* at 148 n.13. The Court denied reargument on March 15, 1999.

### D. Kindler's District Court Habeas Proceedings

On March 13, 2000, Kindler filed a counseled § 2254 habeas petition in the United States District Court for the Eastern District of Pennsylvania which he subsequently amended. The amended petition raised eleven grounds for relief. *See Kindler v. Horn*, 291 F. Supp. 2d 323, 337-38 (E.D. Pa. 2003) (summarizing the claims). In opposing relief, the Commonwealth claimed that the petition was untimely, and that Pennsylvania's fugitive waiver rule was an "independent and adequate" state ground precluding federal habeas relief. The

14

Commonwealth also argued that the claims were meritless.

The district court applied statutory tolling and ruled that Kindler's petition was timely. The court concluded that Kindler's petition for reargument before the Pennsylvania Supreme Court, had tolled the period of limitations. The Supreme Court of Pennsylvania had denied that petition on March 15, 1999. The district court held that Kindler had one year from that date to file his habeas petition. Since he filed it on March 13, 2000, the district court concluded that his petition was timely. *Kindler v. Horn*, 291 F. Supp. 2d at 338-39.

Next, the district court relied in part on *Doctor v. Walters*, 96 F.3d 675 (3d Cir. 1996), in rejecting the Commonwealth's claim of procedural default. There, we had held that Pennsylvania's fugitive forfeiture rule was not firmly established when Kindler escaped. Accordingly, "the fugitive forfeiture rule . . . [did] not provide an independent and adequate

15

basis to preclude federal review of [Kindler's] habeas claims. . .". *Kindler v. Horn*, 291 F. Supp. 2d at 343.

In addressing the merits of Kindler's claim, the district court rejected all of Kindler's challenges to the guilt phase of his trial. However, the court agreed with Kindler's challenge to the penalty phase, and concluded that the trial court's jury instruction was inconsistent with the Supreme Court's pronouncements in *Mills v. Maryland*, 486 U.S. 367 (1988). The court also ruled that Kindler was entitled to relief because of the prosecutor's argument during the penalty phase. The court concluded that the prosecutor had improperly introduced an aggravating circumstance and had also "vouched for the death penalty with respect to [Kindler] . . . in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution." *Kindler v. Horn*, 291 F. Supp. 2d at 367.

The Commonwealth appealed the order granting a new

16

sentencing hearing (C.A. No. 03-9010), and Kindler appealed the denial of relief on his other claims. (C.A. No. 03-9011). The appeals were consolidated, and we granted a certificate of appealability to Kindler allowing him to raise counsel's ineffectiveness at sentencing, and the district court's failure to instruct the jury that he was not eligible for parole if sentenced to life imprisonment. *Kindler v. Horn,* No. 03-9011 (order entered Oct. 21, 2004).

Before addressing the merits of either appeal, we must determine the threshold procedural issues, including whether Kindler's habeas petition was timely filed. If Kindler's claims are timely and not defaulted, we must then determine whether the district court erred in granting relief pursuant to *Mills v. Maryland.* In addition, we must determine whether the court erred in denying relief on Kindred's claim that the trial erroneously failed to instruct the jury that he was ineligible for

17

parole, as well as Kindler's claim of ineffective assistance of counsel during the penalty phase of his trial. As mentioned above, we decilne to address Kindler's prosecutorial misconduct claims.

## II. Timeliness and Procedural Default

The Anti-Terrorism, and Effective Death Penalty Act ("AEDPA") creates a one-year period of limitations for state prisoners to file federal habeas petitions. *See* 28 U.S.C. § 2244(d)(1). The one year clock usually starts ticking when the time for direct review expires. Typically, that is when the United States Supreme Court denies *certiorari* or when the time for seeking *certiorari* review expires. However, the limitation period is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment. . . is pending." 28 U.S.C. § 2244(d)(2).

Kindler and the Commonwealth agree that the limitation

18

period here was tolled until at least December 11, 1998 when the Pennsylvania Supreme Court rejected his appeal of the denial of PCRA relief.[5]   As noted earlier, thereafter, Kindler filed for reargument of that December 11 ruling, and that petition for reargument was not decided until March 15, 1999. The parties disagree about whether the filing period was tolled while his petition for reargument was pending before the Pennsylvania Supreme Court.  If the period was not tolled by filing the petition for reargument, Kindler's one year limitation period expired on December 10, 2000, and his March 13, 2000

_____

[5] Kindler's PCRA petition was pending as of April 24, 1996, when AEDPA became effective, and remained pending at least through December 11, 1998 when the Pennsylvania Supreme Court denied Kindler's state habeas petition. *See* 28 U.S.C. § 2244(d)(2); *see also, Burns v. Morton*, 134 F.3d 109, 111 (3d Cir.1998); *Miller v. N.J. State Dep't of Corrs.,* 145 F.3d 616, 617 (3d Cir.1998) (holding that for convictions that became final prior to AEDPA's enactment, the AEDPA limitations period begins on AEDPA's effective date of April 23, 1996).

19

federal habeas petition would therefore be untimely. Conversely, if the AEDPA clock was tolled while that petition was pending, the habeas petition was timely filed as detailed above.[6]

Congress specifically provided that the one year period for filing a federal habeas petition is tolled while "a properly filed application for state post-conviction review or other collateral proceeding is pending."  28 U.S.C. § 2244(d)(2). AEDPA does not specifically define that phrase or explain what it includes.  Nevertheless, we have held that an application for relief that is permitted under state law and filed in accordance with the state's procedural requirements, tolls the filing period

---

[6]We reject the Commonwealth's argument that the limitation period was not tolled from December 11, when the the PCRA petition was denied to December 20th when the motion for reargument was filed because there was nothing pending before a court during that time. *See Carey v. Saffold,* 536 U.S. 214 (2002) (petitioner's application would be considered as pending during 4 ½ month time between denial of lower court petition and filing of appeal of that decision so long as the appeal was filed in accordance to state law.)

20

under AEDPA. *Compare Lovasz v. Vaughn*, 134 F.3d 146 (3d Cir. 1998) (a prisoner's second state habeas petition tolled the AEDPA period of limitations because the state courts permitted successive habeas petitions, and occasionally granted relief on these petitions.); *with Douglas v. Horn*, 359 F.3d 257 (3d Cir. 2004) (a notice to appeal *nunc pro tunc* did not toll the limitation period because Pennsylvania courts do not recognize *nunc pro tunc* appeals as a permissible avenue for post-conviction relief.).

The Commonwealth does not dispute that Kindler properly filed his motion for reargument within 14 days of the denial of relief, as required by state law. Rather, the Commonwealth argues that motions for reargument are petitions for "extraordinary relief," and therefore not encompassed within the meaning of "a properly filed petition" under AEDPA. The Commonwealth rests this argument on its contention that such

petitions are "not favored" under Pennsylvania law. According to the Commonwealth such petitions are an exceptional form of relief and Congress could therefore not have intended the AEDPA clock to stop ticking while such a motion was pending.

However, we have found no Pennsylvania statute, case or rule prohibiting motions for reargument and the Commonwealth does not direct us to any. Indeed, Pennsylvania appellate practice specifically provides for a motion for reargument, and sets forth the time for filing such a motion. *See* Pa.R.A.P. 2542 (setting forth a 14 day time limit for filing a motion for reargument as well as other procedures for such motions); *see also* Pa.R.A.P. 2543-2547. Moreover, not surprisingly, capital defendants in Pennsylvania routinely seek reargument when their claims for relief are denied, and the Pennsylvania Supreme Court has granted such motions on more than one occasion. *See Commonwealth v. Saranchak*, 810 A.2d 1197 (Pa. 2002) (on

22

reargument, granting reinstatement of PCRA petition that had been dismissed on appeal); *Commonwealth v. Young,* 748 A.2d 166 (Pa. 2000)(on reargument, granting relief on claim that was denied in original decision); *see also*, *Lovasz v Vaughn*, 134 F.3d 146 (3d Cir. 1998) (considering the fact that the state historically allowed a certain type of filing in determining that such a filing tolls the AEDPA statute of limitations).

The Commonwealth nevertheless claims that Kindler's motion for reargument should not toll the limitation period here because it was not necessary to exhaust state remedies. According to the Commonwealth, only proceedings that are required to exhaust a claim toll the limitation period under AEDPA. That argument is not rooted in the text of AEDPA or any decision of this court of the Supreme Court. Rather, the Commonwealth rests this argument upon the logic of harmonizing AEDPA's requirements for exhaustion and tolling.

23

The Commonwealth also argues that this interpretation of AEDPA's one year time limit prevents habeas petitioners from tolling the limitation period indefinitely with a series of "exotic" petitions for "extraordinary" relief. We disagree.

Nothing in the text of AEDPA suggests that Congress intended any such linkage. To the contrary, that text undermines the Commonwealth's attempt to read exhaustion into the statute's tolling requirements. Section 2244 conditions AEDPA tolling only upon properly filling an application for post-conviction or collateral review. Once properly filed, the time during which the petition is pending is explicitly tolled under § 2244. Congress could easily have declared that the limitations period would only be tolled while any petition required to exhaust claims is pending in state court. It did not do so, and we can not amend the statute by adopting the Commonwealth's attempt to forge a nonexistent link between exhaustion and

24

statutory tolling.[7]

Moreover, we rejected a similar argument in *Sweger v. Chesney*, 294 F.3d 506 (3d Cir. 2002). There, we concluded that the plain text of 28 U.S.C. § 2244 undermines any policy justification for linking AEDPA's tolling requirements with its exhaustion requirements. Specifically, we had to determine

> whether this tolling provision applies on a claim-by-claim basis, requiring at least one or more of the issues raised in the state collateral proceeding to be included in the federal habeas petition, or whether a state post-conviction proceeding attacking a judgment of conviction tolls the period of limitations for the entire habeas petition attacking that same judgment.

294 F.2d at 513.

We held that Congress did not intend AEDPA's tolling

---

[7]Indeed, it is ironic given considerations of deference and comity so frequently relied upon in arguing against federal relief that the state would now ask us to ignore a procedure provided under state procedural law and utilized by the state's highest court.

25

provision to be applied on a case by case basis. We noted that our decision would have been the same even if we factored policy considerations into our analysis because separate rules for tolling and exhaustion advance, rather than retard, the goals of federalism and comity enshrined in AEDPA. *Id.* at 519-520 (" the statute of limitations . . . and the exhaustion doctrine . . . impose entirely distinct requirements on habeas petitioners; [although] both must be satisfied before a federal court may consider the merits of a petition."). Maintaining the distinction encourages habeas petitioners to utilize all avenues for review authorized under state law before seeking habeas relief in federal court. *Id.*

Moreover, we are simply not impressed by the Commonwealth's concern that habeas petitioners may endlessly extend AEDPA's one year filing deadline by resorting to exotic or "extraordinary" state petitions. That theoretical concern, not

26

exemplified here, does not justify the forced reading of AEDPA required by the Commonwealth's position.

## B. Procedural Default

As noted above, the Pennsylvania courts applied Pennsylvania's fugitive forfeiture rule and concluded that Kindler waived his right to seek appellate review. They thus dismissed his appeals without reaching the merits of any of his claims. As a matter of comity and federalism, a federal court cannot rule on the merits of a habeas petitioner's claims when a state court has found such claims to be procedurally defaulted pursuant to an independent and adequate state procedural rule unless the petitioner shows cause and prejudice for the default. *See Doctor v. Walters,* 96 F.3d 675, 683 (3d Cir. 1996). The district court reasoned that, in this case, Pennsylvania's fugitive forfeiture doctrine did not preclude review of the merits of Kindler's claims. We agree.

27

A state procedural rule precludes federal habeas review only if it is "firmly established" and "consistently and regularly applied" by the state's courts. *See Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *see also Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural rule must be "firmly established and regularly followed" to bar federal habeas review). In addition, the state rule must speak in unmistakable terms, and the state courts' refusal to review a petitioner's claim must be consistent with decisions in similar cases. *See Doctor v. Walters,* 96 F.3d at 683-684*; Neely v. Zimmerman*, 858 F.2d 144, 148 (3d Cir.1988). A procedural rule that is consistently applied in the vast majority of cases is adequate to bar federal habeas review even if state courts are willing to occasionally overlook it and review the merits of a claim for relief where the rule would otherwise apply. *Id.* Furthermore, the adequacy of the rule is determined by the law in effect at the time of the

28

asserted waiver, not when the petitioner subsequently seeks review in federal court. *See Doctor*, 96 F.3d at 684.

Despite the Commonwealth's efforts to distinguish this case, our analysis of Kindler's procedural default is controlled by our analysis in *Doctor*. There, we held that Pennsylvania's fugitive forfeiture rule did not bar federal habeas review as applied to Doctor, a habeas petitioner who had, like Kindler, escaped. Doctor escaped in 1986 during a lunch recess of his criminal trial, but the trial resumed after the recess and he was convicted *in absentia*. *Id.* at 678. Five years later, after he was captured and sentenced, he appealed. The Pennsylvania courts applied the fugitive forfeiture rule and refused to consider the merits of his appeal. *Id.* On federal habeas review, the Commonwealth argued that the state courts' application of the fugitive waiver doctrine precluded federal habeas relief. We disagreed because the rule was not being consistently or strictly

29

applied when Doctor escaped in 1986. *Id.* at 684-686. After surveying decisions of Pennsylvania courts we concluded that Pennsylvania courts had discretion to hear an appeal filed by a fugitive who had been returned to custody before an appeal was initiated or dismissed. *Id.* at 686. Accordingly, the fugitive forfeiture rule was not "firmly established" and therefore was not an independent and adequate procedural rule sufficient to bar review of the merits of a habeas petitioner in federal court.

Here, Kindler escaped from custody in 1984 while his post-verdict motions were pending. Kindler, like Doctor, was returned to custody before any direct appeal of his conviction or sentence was initiated. The Commonwealth seeks to distinguish *Doctor* because Kindler's escape resulted in the dismissal of post-verdict motions that were pending when he escaped. The Commonwealth contends that the dismissed post-verdict motions were analogous to a dismissed appeal. Therefore,

30

argues the Commonwealth, the state appellate courts had no more discretion to re-instate Kindler's post-verdict motions than they had to reinstate a dismissed appeal. Despite its facial appeal, we cannot agree with this interpretation of *Doctor*.

In *Commonwealth v. Galloway*, 333 A.2d 741 (Pa. 1975), as discussed in *Doctor*, the Pennsylvania Supreme Court re-instated supplemental post-verdict motions that had been dismissed pursuant to the fugitive forfeiture rule. The court did so because once the defendant was apprehended, he was returned to the jurisdiction of the court, and would therefore be responsible for, and subject to, the court's judgment. *Galloway* thus underscores a critical distinction between dismissed post-verdict motions and a dismissed final appeal. That distinction arises from the fact that after an appeal is dismissed, a court no longer retains jurisdiction. However, appellate courts can exercise jurisdiction after post-verdict motions are

31

dismissed, and they therefore can exercise discretion to hear the claims of defendant's appeal.  Thus, *Galloway* fatally undercuts the Commonwealth's attempt to distinguish Kindler's situation from Doctor's based upon differences in the procedural posture at the time of their respective escapes. When Kindler escaped in 1984, *Galloway* had not been overruled.  Accordingly, the state trial court still had discretion to reinstate his post-verdict motions.   Accordingly, we conclude that, under *Doctor*, Pennsylvania's fugitive waiver law did not preclude the district court from reviewing the merits of the claims raised in Kindler's habeas petition.

### III.  Kindler's Claims.

We review the district court's resolution of Kindler's claims *de novo*.  *See Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001).  We do not apply the deferential standard of review otherwise applicable under AEDPA because Kindler's claims

32

have never been "adjudicated on the merits" in state courts. *See Bronshtein v. Horn*, 404 F.3d 700, 710 (3d Cir. 2005).

## A. *Mills v. Maryland*

Kindler contends that his sentence was imposed in violation of the Eighth Amendment, as construed in *Mills v. Maryland* and *Boyde v. California,* 494 U.S. 370 (1990). More specifically, Kindler contends that the jury instructions and verdict slip created a reasonable likelihood that the jury believed it could only consider mitigating circumstances that jurors unanimously agreed upon. The district court agreed and granted a conditional writ requiring the Commonwealth to either conduct a new sentencing hearing or cause Kindler to be sentenced to life imprisonment.

In *Mills v. Maryland*, the Supreme Court held that the Constitution prohibits a state from requiring jurors to unanimously agree upon the existence of a particular mitigating

33

circumstance before weighing that circumstance against any aggravating circumstances during the penalty phase of a capital trial. The Court illustrated with a "disturbing scenario" wherein eleven jurors agreed upon a mitigating circumstance but concluded that they could not consider it because a 12th juror disagreed that it exists. *Mills,* 486 U.S. at 373. That single juror's view of the facts would result in the death penalty being imposed despite the will of the overwhelming majority of the jurors. Equally disturbing to the Court was the possibility that all twelve jurors would each find a mitigating circumstance, but not be able to agree on the existence of any one "mitigator." Such a jury would also recommend a sentence of death because it would erroneously conclude that there was nothing to weigh against the aggravating circumstances that may exist. *Id.* The Court thus concluded that the Eighth Amendment requires that jurors be allowed to consider any and all mitigating

34

circumstances without the requirement of unanimity. *Id.* at 384.

Accordingly, a death sentence must be vacated if there is a substantial probability that the jury charge caused a reasonable juror to believe that mitigating circumstances can not be considered unless all jurors agree on the existence of the mitigating circumstance. *Id.*

The Supreme Court later clarified *Mills* in *Boyde v. California.* In *Boyde,* the Court explained that the inquiry under *Mills* was whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration" of relevant mitigating circumstances that the defendant proffered.

Here, the court's instruction at the beginning of the penalty phase included the following explanation:[8]

---

[8]Kindler's counsel objected to this charge on the record. Joint Appendix ("JA"), 204-205.

35

Now, the aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt. Mitigating circumstances must be proved by the defendant by a preponderance of the evidence. A preponderance of the evidence is somewhat less proof than is required for reasonable doubt.

Now, the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in that list, subsection "D" and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

The verdict must be a sentence of life imprisonment in all other cases. The court may in its discretion discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment. The court shall instruct the jury on any other matters that may be just and proper under the circumstances . . . .

JA 73-74 & 196-97.[9]

_____

[9]The second time that the judge read the instructions, he removed the words "in that list" and added a filler phrase; "which you have seen," so that the instructions read:

36

Moreover, the verdict slip read:

> We, the jury empaneled in the above entitled case, having heretofore determined that the defendant is guilty of murder in the first degree, do hereby find:

> AGGRAVATING CIRCUMSTANCE(S)

> The victim was a fireman, peace officer, or public servant concerned in official detention who was killed in the performance of his duties ()

> The defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim ( )

> The victim was being held by the defendant for ransom or reward, or as a

---

Now, the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified subsection "D," which you have seen and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

JA 197.

37

shield or hostage ( )

The death of the victim occurred while defendant was engaged in the hijacking of an aircraft ( )

The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses ( )

The defendant committed a killing while in the perpetration of a felony ( )

In the commission of the offense the defendant knowingly created a grave risk Of death to another person in addition to the victim of the offense ( )

The offense was committed by means of torture ( )

The defendant has a significant history of felony convictions involving the use or threat of violence to the person ( )

The defendant has been convicted

38

of another Federal or State offense, committed either before or at the time of the offense at issue for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense ( )

<u>M I T I G A T I N G</u>
<u>CIRCUMSTANCE(S)</u>

The defendant has no significant history of prior criminal convictions ( )

The defendant was under the influence of extreme mental or emotional disturbance ( )

The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired ( )

The age of the defendant at the time of the crime ( )

39

The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under Section 309 (relating to duress), or acted under the substantial domination of another person ( )

The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts ( )

The defendant's participation in the homicidal act was relatively minor ( )

Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense ( )

The aggravating circumstance(s) outweigh the mitigating circumstance(s) YES ( ) NO ( )

We the jury render the following sentencing verdict:

DEATH ( )

LIFE IMPRISONMENT ( )

40

JA 213-15.

In addition, the following exchange occurred between the court and the jury foreperson when the jury returned to ask a question during deliberations:

> JURY FOREPERSON: Do we have to apply any checkmarks besides the aggravating and mitigating circumstances on the final sheet? What I'm saying, is that there's a poll taken and say were using all 10 questions, you know, just for example, and there's quite a possibility that all 12 people would pick all 10. Do you want a checkmark or do you want a number beside those?
>
> THE COURT: I'll just read the instructions from the law and then I'll answer your question. The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance that's specified in subsection D and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
>
> In other words, the only ones that you would mark

41

off and report would be [the ones] that all of you had agreed upon. Are there any further questions?

JURY FOREPERSON: You don't want a number there; you just want a checkmark.

THE COURT: A checkmark.

JA 198-200.

The judge's answers thus exacerbated the *Mills* problem that already infected the jury's deliberations based upon the misleading and ambiguous wording of the jury charge. That charge clearly created a reasonable likelihood that the jurors may have believed that they could only consider the mitigating circumstances that they unanimously agreed upon. The language quoted above instructed the jury that: "*the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstances or if the jury unanimously finds one or more aggravating*

42

*circumstances which outweigh any mitigating circumstances."*

Thus, "unanimous" modifies "finds" and creates a reasonable likelihood that the jurors erroneously believed that mitigating and aggravating circumstances both had to be unanimously agreed upon. Nowhere were the jurors told that they only had to unanimously agree on aggravating circumstances and not mitigating circumstances, or that the requirement of unanimity did not apply to any mitigating circumstance that any juror may have found by a preponderance of the evidence.

This conclusion is consistent with our recent holding in *Abu-Jamal v. Horn*, 520 F.3d 272 (3d Cir. 2008), as well as other cases where similar instructions were given.[10] *See Albrecht*

[10] In *Abu-Jamal*, we rejected the Commonwealth's contention that our decision upholding the charge in *Zettlemoyer v. Fulcomer,* 923 F.2d 284 (3d Cir.1991) precluded a *Mills* violation in that case. *See Zettlemoyer*, 923 F.3d at 308 (upholding charge instructing the jury to impose death if they unanimously agree and find that the aggravating circumstances outweigh the mitigating circumstances.).

*v Horn*, 471 F.3d 435 (finding a *Mills* violation, but vacating the district court's order granting habeas relief after applying *Teague v. Lane*); *Banks v Horn*, 271 F.3d 527 (3d Cir. 2001), rev'd on other grounds by *Beard v. Banks*, 542 U.S. 406 (2004); *Frey v. Fulcomer,* 132 F.3d 916, 923-24 (3d Cir.1997).

In addition, as we have just explained, the confusion was amplified by the court's exchange with the jury foreperson when the jury returned to ask a question during deliberations.

Finally, the error was further exacerbated by the wording of the verdict slip. Unlike *Hackett v. Price,* 381 F.3d 281 (3d. Cir. 2004), where the verdict slip established that the jury agreed that there were no mitigating circumstances, the verdict slip here offered no direction regarding how findings were to be made. Moreover, no boxes were checked. This may mean that no juror found any mitigating circumstance as the Commonwealth argues. However, it is equally likely that jurors could not

44

unanimously agree on any particular mitigating circumstance even though one or more juror was convinced a mitigating circumstance had been established, and that the jury assumed that the mitigating circumstance could not be weighed because of the lack of unanimity. Accordingly, the district court properly granted relief under *Mills*.

## B. Ineffective Assistance of Counsel[11]

Kindler also contends that his attorney's performance during the penalty phase deprived him of effective assistance of counsel under the Sixth Amendment because his attorney failed to investigate his social and family history or his mental health

---

[11] Although our conclusion that the district court did not err in granting relief under *Mills* is itself sufficient to affirm the conditional writ that the district court granted and decide Kindler's appeal, we think it important to also discuss Kindler's claim of ineffective assistance of counsel during the penalty phase because of the importance of the issue to our jurisprudence, the gravity of the consequence of the alleged deficiency, and the need to provide guidance in future cases.

45

history.

Ineffective assistance of counsel claims are governed by the familiar two-prong inquiry set forth in *Strickland v. Washington,* 466 U.S. 668, 687 (1984), requiring a petitioner to show that counsel's performance was deficient and that the deficiency prejudiced him. The first prong is established by demonstrating that counsel's performance fell below an objective standard of reasonableness. *Id.* The reasonableness of counsel's performance is assessed on the facts of the particular case at the time of the challenged conduct or omission. *Id.* at 689. The prejudice inquiry requires a showing that "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Kindler submitted an affidavit from Daniel-Paul Alva, his

trial counsel, in support of his *Strickland* claim. That affidavit includes the following declaration:

> Mr. Kindler's case was my first capital trial. I did not have any experience or training in how to handle capital cases, in particular the penalty phase of the proceeding.
>
> I concentrated my efforts on attempting to create a reasonable doubt as to Mr. Kindler's guilt, although I was aware that there was a strong likelihood that Mr. Kindler would be convicted.
>
> I did not conduct a penalty phase or mitigation investigation. In particular, I did not talk to Mr. Kindler or any of his family members about his family background. Mr. Kindler's family was available to me. His parents had retained me, and they attended the trial. I simply did not think about investigating or presenting evidence concerning family background at the penalty phase.
>
> I also did not attempt to obtain any school, medical or other records relating to Mr. Kindler. I did not have a strategic or tactical reason for not seeking such records; it just did not occur to me that such records could be helpful.
>
> I also did not consider obtaining any mental health evaluation of Mr. Kindler. Again, there was no strategic

47

or tactical reason for my failure to do so.

S.A. 25.

Kindler also submitted declarations from his parents, his sister, a friend, a psychologist and a psychiatrist detailing information that Kindler claims would have been uncovered by an adequate investigation. Kindler's parents and sister detailed Kindler's upbringing. Kindler's parents fought frequently and violently. In these fights, his parents threw household items, dishes, shoes, and furniture at each other. Kindler personally witnessed these fights, and they left him terrified and crying. Kindler's mother was violent, depressed, and often intoxicated. She attempted suicide on several occasions. Kindler's father was so controlling that he even restricted the amount of water, electricity, and other resources available to Kindler and his sister. After Kindler's mother separated from his father, Kindler's father threatened to kill her and the children. Supp.

48

App. 7. Kindler's sister described the situation as "living with two crazy people that could not control themselves." Supp. App. 12.

The declarations also state that both of Kindler's parents abused him. His mother was verbally abusive. *Id.* She also threw food at Kindler, and once dumped soup on his head when he wouldn't eat. Kindler's father physically abused him with electrical cords. These beatings would leave him with welts on his back, and blood showing through his shirt. After his mother and father separated, Kindler lived with his father, and they fought frequently. Their relationship deteriorated to the point where Kindler's sister described an instance where Kindler and his father threw bricks at each other during a fight. Kindler's friend described a motorcycle accident Kindler was involved in when Kindler was a "preteen." Supp. App. 16. The motorcycle Kindler was riding on was hit by a car causing

49

Kindler to lose consciousness for a few minutes. After regaining consciousness, Kindler was dazed and confused, and could not remember the accident. His speech was also incomprehensible. Despite those symptoms, Kindler was not taken to a hospital or given medical treatment.

Perhaps most importantly, in her affidavit, psychologist, Carol Armstrong, Ph.D., declared that Kindler suffered from frontal lobe impairment that can affect judgment, and the ability to control impulsive behavior. The frontal lobe impairment is consistent with Kindler's history of head injuries, and physical and emotional abuse. She also attested to the cognitive, developmental, and emotional effects that the neglect, abuse, and violence that surrounded Kindler could have had upon him. Armstrong additionally noted that the tests she performed could have been performed and would have resulted in the same conclusions at the time of Kindler's penalty phase proceedings.

50

As if this were not sufficiently derelict, psychiatrist, Robert A. Fox, declared that he also evaluated Kindler and reviewed various records. Fox diagnosed Kindler as suffering from "mood disorder due to a general medical condition with mixed features" and "narcissistic personality disorder" at the time of the crimes. Supp. App. 23. He stated that the mood disorder caused periods of hypomanic symptoms interspersed with periods of depression and significant distress and impairment in Kindler's life. According to Dr. Fox, similar distress resulted from the narcissistic personality disorder, which is characterized by grandiosity, a need for admiration, and a lack of empathy. Fox concluded that these two disorders, in combination with the history of physical and emotional trauma, were impairments that constituted an extreme mental or emotional disturbance.

The district court concluded that Alva's performance did

not violate Kindler's Sixth Amendment right to effective assistance of counsel. The court reasoned that although Alva's failure to investigate Kinder's personal and psychological history constituted deficient performance under the first *Strickland* prong, that failure did not prejudice Kindler, and he therefore could not prevail under the second prong. The district court believed that this evidence could have been viewed as a mitigating circumstance, but the court did "not believe that the jury could have determined that this mitigating factor adequately outweighed the two aggravating factors found." *Id.*

Both parties assert that the district court erred. The Commonwealth argues that the court erred in ruling that Alva's performance was deficient; Kindler argues that the district court erred by holding that the deficient performance did not result in prejudice.

It is difficult to understand how the Commonwealth can

sincerely argue that the kind of information set forth above could not have been viewed as a mitigating circumstance by the jury or how Alva's failure to investigate it could be viewed as anything other than deficient representation. Defense counsel in capital cases has a duty to reasonably investigate the existence of mitigating evidence unless reasonable strategic judgments support a decision not to. *See Strickland*, 446 U.S. at 691. Here, Alva admits that his failure to investigate Kindler's history was not the result of any strategic or tactical decision. Supp. App. 25. Rather, it resulted solely from his lack of experience in capital cases, and the fact that it never occurred to him to investigate Kinder's history. *Id.* Although the Commonwealth insists that Alva is "falling on his sword" for a former client, nothing on this record contradicts the veracity of his sworn affidavit, and the district court did not rest its decision on any doubt about the veracity of Alva's sworn declarations.

The Commonwealth also argues that Kindler's *Strickland* claim is belied by the quality of the mitigation case that Alva presented during the penalty phase of Kindler's trial. The Commonwealth points to the five witnesses that Alva called on Kindler's behalf and the testimony he elicited regarding Kindler's usefulness to society. The Commonwealth also points to Alva's impassioned final argument asking the jury to spare Kindler's life. This misses the point. We do not suggest that Alva's performance was deficient because he inadequately presented the limited information that he had. Rather, Alva's performance was deficient because his failure to adequately investigate mitigation evidence of mitigation materially limited what evidence he could present to the jury. Indeed, the skillful manner in which Alva presented the limited evidence that he did have illustrates the potential force of the mitigation evidence that he did not have because he so limited the scope of his

54

mitigation investigation.

Alva, a very skillful and forceful advocate, only presented testimony that Kindler was skilled in electronics, and could be productive in prison. That mitigation pales in comparison to the mitigating circumstances that a proper investigation of Kindler's background would have developed. In finding that Alva's performance did not prejudice Kindler, the district court considered only the evidence proffered by the two experts relating to Kindler's frontal lobe impairment and his personality and mood disorders. *Kindler v. Horn*, 291 F.Supp. 2d at 356. The court found that the mitigating circumstance of Kindler's emotional disturbance would have been established by the experts, but (in what it termed "a close call") the court held that the evidence was 'insufficient to undermine confidence in the outcome of the sentencing verdict." *Id*. We disagree; this evidence, in conjunction with proposed testimony regarding

55

Kindler's chaotic and violent childhood with "two crazy people" for parents who constantly abused him (and each other in his presence), is sufficient to meet the second prong of the *Strickland* inquiry. *See Rompilla v. Beard,* 545 U.S. 374 (2005) (defendant was victim of physical abuse and neglect from alcoholic parents); *Wiggins v. Smith*, 539 U.S. 510 (2003) (defendant suffered extreme parental neglect, severely abused by his mother, and sexually abused as a child) ; *Williams v. Taylor*, 529 U.S. 362 (2000) (defendant was severely neglected as a child); *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) (defendant was physically abused by father, and sexually abused by others).

Kindler's jury could easily have considered evidence of his chaotic and abusive childhood as "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Cons. Stat. § 9711(e)(8).

56

We can not say with confidence that the penalty phase would have had the same result if the jurors had been able to weigh the two aggravating circumstances that were established beyond a reasonable doubt against the evidence of mitigation that a proper investigation would have presented. The evidence might well have been accepted as explaining (though certainly not excusing) Kindler's impulsive actions including why he was so willing to kill and brutalize Bernstein.

Accordingly, we find that Kindler is also entitled to a new penalty hearing because his counsel's deficient performance during the penalty phase deprived him of the effective assistance of counsel that the Sixth Amendment requires.

## C. Vouching

Kindler claimed that the prosecutor's argument during the penalty phase violated his constitutional rights by improperly

vouching for the death penalty.   He challenged the following

part of the prosecutor's statement:

> Let me at this point, ladies and gentlemen, tell you the position, the position of the office, the position of the Commonwealth.
>
> We in this case seek and urge through the evidence and the law the death penalty against Joseph Kindler.
>
> In reference to Scott Shaw, I will argue and present both of the sides and it is up to you to decide against both of these particular individuals what penalty you feel appropriate. That would be the case no matter what our office's position is but I felt from the outset here that I would let you know that the urging would be done based on the evidence would be against Mister Kindler.
>
> That does not mean that you cannot or would not, based on the evidence and the law return such a penalty if you felt appropriate, against Mister Scott Shaw. That is your power and if you find it your duty in connection with what the law is,

58

then I am sure you would do it but I, at least, wanted to let you know that now.

Kindler argued that this was tantamount to improperly vouching for a sentence of death for him because the prosecutor improperly informed the jury that the official position of the District Attorney's Office was that he should be put to death, but the District Attorney did not care about whether his co-defendant should be executed. The district court agreed, and the Commonwealth appeals that ruling.

The district court reasoned:

> In considering [the prosecutor's argument], we find it clearly constituted improper vouching and harmful, constitutional error. Indeed, the entire premise of the prosecutor's argument was that the Commonwealth possessed even stronger evidence of Joseph Kindler's guilt and statutory aggravators than that presented to the jury and that 'was why the urging would be done based on the

59

evidence... against Mister Kindler.'

We disagree. "Our case law indicates that to find vouching, two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir.1998). The prosecutor's statements here do not meet either requirement.[12] The prosecutor did not draw upon evidence outside of the record to assure the jury of the

---

[12] We do not suggest that a defendant can never establish improper prosecutorial vouching if the challenged statement does not rigidly adhere to these criteria as there may be situations where the prosecutor's argument so strongly invokes the authority of his/her office and so blatantly crosses the line of propriety that it is tantamount to unconstitutional vouching. *See United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992). However, no such circumstance is present here, and our analysis therefore proceeds along the familiar two prong inquiry discussed in *Walker*.

credibility of a prosecution witness or the strength of the Commonwealth's case. Rather, the prosecutor emphasized that the jury's decision must be based on the law and the evidence. Although he informed jurors that he was specifically requesting the death penalty for Kindler and not Shaw, he also stated that the jury must make its own decision about what sentence was appropriate for Kindler and his codefendant irrespective of the Commonwealth's position.

Although it would have been far better for the prosecutor to simply make his argument without informing the jury of the official position of the District Attorney, his statements here are distinguishable from those that have required relief in other cases. For example, in *Shurn v. Delo*, 177 F.3d 662 (8th Cir. 1999), the prosecutor, after linking the defendant to notorious mass murderer Charles Manson, and imploring the jury to kill the defendant several times, stated: "I'm the top law

61

enforcement officer in this county and I'm the one that decides in which cases to ask for the death penalty . . . . I'm telling you there's no case that could be more obvious than the [defendants']." 177 F.3d at 666.

Although we disagree with the District Court's view of Kindler's vouching claim, we agree it comes perilously close to the evils enunciated in *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985). There, the prosecutor made an unsupported claim that he had only sought the death penalty in a few cases during the past year, which improperly implied "that the prosecutor's office had already made the careful judgment that [that] case, above most other murder cases, warranted the death penalty." *Id.* at 1383. The prosecutor's statement here did not purport to draw upon evidence outside the record in order to distinguish between Kindler and his codefendant. *Cf. Giglio v. United States*, 405 U.S. 150, 154 (1972).

62

## D. Non-Statutory Aggravating Factors

Kindler also objected to the following portion of the prosecutor's argument during the penalty phase:

> There has been testimony that you heard that Mister Shaw was in fact led. You have heard testimony from his grandmother, as a matter of fact, that he in fact got into trouble because he was led as a result of other people, because of the failure perhaps at times to have sufficient male companionship among other things. If that were the case and you must accept that does not lessen in terms of guilt of a crime indeed not as you had found.

> But as you must consider in reverse what and where that puts the individual that organized and effectuated this particular act, for . . . that man has not only forever ruined the life of an individual so that he is dead but ruined the life of another individual because of his influence, intensity, clarity of purpose and methods in detail. . . That is what we are talking about.

> If you believed that Mister Shaw was in fact led, if you believe that he, as a, at the time, 16 year old boy, who was under the influence of older people and if you believe that either indirectly or whatever, there was a certain amount of coercion,

63

although not sufficient to negate the crime, if you would accept that, well yes, you could find of course mitigating circumstances in that. So you must consider, however, ever there the aggravating circumstances that I had mentioned. That's up to you to decide.

But in reference to Mister Kindler, it's an entirely different story. Because with that, we are talking about, a leader, the actor, the one with the idea, the one with the motive, the one with the push throughout, the one that came back and said he's not dead yet; I had to use a concrete stone to drop him in the river. Ladies and gentlemen, that alone. We are talking about weighing, we are talking weighing of circumstances to see where the aggravating circumstances and the mitigating would apply, how they in fact would be in reference to weighing each other.

The district court concluded that this argument was tantamount to asking the jury to impose the death penalty based upon a "non-statutory" aggravating circumstance; that Kindler was the leader who had organized the murder and in doing so exerted undue influence over a vulnerable codefendant. The Commonwealth appeals.

64

We agree that the prosecutor's argument was improper. Neither Kindler's role in the murder, nor his influence over Shaw can properly be considered an aggravating circumstance under the applicable statute. See 42 Pa. Cons. Stat. § 9711(d). Rather than limit his argument to the aggravating factors defined by the legislature, the prosecutor invited the jury to impose the death penalty based upon his own view of the importance of Kindler's role and manipulation of Shaw. The prosecutor's argument introduced an invalid sentencing factor into the analysis, which is an error of constitutional magnitude. *Cf. Brown v. Sanders,* 546 U.S. 212, 220 (2006).

That said, this error did not have any "substantial and injurious effect" on the deliberations. *Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007). At Kindler's sentencing, the jury found two aggravating factors unrelated to the prosecutor's improper

65

argument, and no mitigating factors.[13]  The jury was instructed that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance. . . and no mitigating circumstances."   We presume that the jury followed these instructions, and therefore we must conclude that the jury would have sentenced Kindler to death whether or not the improper argument was presented.  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (stating the "almost invariable assumption of the law that jurors follow their instructions."). The result of the equation would be the same whether the jury weighed  2 aggravating circumstances against none or  3 aggravating circumstances to none. In either case, the absence of any mitigating factors would tip the balance in favor of a sentence of death.  Accordingly, the admission of the improper

---

[13]We assume for this inquiry that the jury's findings were not affected by the *Mills* error or the ineffective assistance of counsel.

argument was harmless.

## E. *Simmons v. California*

Kindler also argues that the penalty phase was flawed because the trial court did not inform the jury that "life" means life in Pennsylvania and he would not be eligible for parole if sentenced to life imprisonment. In *Simmons* v. *South Carolina,* 512 U.S. 154 (1994), the Court held that not informing a jury that a defendant would never be released on parole if sentenced to life was a violation of due process requiring a new penalty phase. However, that requirement is only applicable when the prosecution argues future dangerousness. the Court explained:

> Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing

67

determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause.

512 U.S. 154, 164. Kindler's future dangerousness never became an issue here. Therefore, the rule in *Simmons* simply does not apply.

## V.  Conclusion

To summarize: we conclude that the jury instructions and verdict sheet that were used during the penalty phase of Kindler's trial denied him due process of law pursuant to the holding in *Mills v. Maryland.* We also find that Kindler was denied effective assistance of counsel during the penalty phase. However, we find no merit in the remainder of Kindler's claims.

Accordingly, the order of the district court granting a conditional writ of habeas corpus and ordering either a new

sentencing hearing within 180 days or a sentence of life

imprisonment will be affirmed.